## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA,

### ALEXANDRIA DIVISION

AA, AA SPOUSE, AA CHILD 1, AA CHILD 2, BB, BB SPOUSE, BB CHILD 1, BB CHILD 2, BB CHILD 3, BB CHILD 4, BB CHILD 5, BB CHILD 6, CC, CC SPOUSE, CC CHILD 1, CC CHILD 2, CC CHILD 3, DD, DD SPOUSE, DD CHILD 1, DD CHILD 2, DD CHILD 3, EE, EE SPOUSE, EE CHILD 1, EE CHILD 2, FF, FF SPOUSE, FF CHILD 1, FF CHILD 2, FF CHILD 3, FF CHILD 4, FF CHILD 5, GG, AND GG SPOUSE,

                       Plaintiffs,

    *– versus –*

UNITED STATES DEPARTMENT OF STATE,

MARCO RUBIO, in his official capacity as Secretary of the United States Department of State,

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

KRISTI NOEM, in her official capacity as Secretary of the United States Department of Homeland Security,

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

JOSEPH B. EDLOW, in his official capacity as Director of the United States Citizenship and Immigration Services,

                and

THE UNITED STATES OF AMERICA,

                      Defendants.

Case No. 1:25-cv-1819

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      This action challenges Defendants' unlawful application of Presidential Proclamation 10949—which bars entry into the United States of foreign nationals from certain countries—to "follow-to-join" spouses and children of Afghan allies who sought refuge and were granted asylum in the United States after they took unimaginable risks to aid the United States' military campaign in Afghanistan following the September 11 attacks.

2.      United States law provides for the right to seek asylum and refuge from persecution; torture; and cruel, inhumane, and degrading treatment, including death. Enshrined within the law is the right for individuals, once granted asylum, to seek reunification with family members they left behind—spouses and children who often face similar risk of persecution, harm, or death abroad—through a formal "follow-to-join" process.

3.      Plaintiffs in this action are Afghans who were paroled into the United States following the United States' withdrawal from Afghanistan in 2021 and then granted asylum ("Asylee Plaintiffs"), as well as their family members who already have been approved for derivative asylum through the "follow-to-join" pathway ("Derivative Plaintiffs").

4.      Asylee Plaintiffs spent years risking their lives and the lives of their families to support the United States' efforts to topple the Taliban and establish a U.S.-aligned, democratic government in Afghanistan. They worked for and with the U.S.-allied government, including as pilots, soldiers, and bodyguards.

5.      Following the chaotic fall of the U.S.-backed government in Afghanistan and the violent Taliban takeover, Asylee Plaintiffs were forced to flee Afghanistan, leave their families behind, and seek refuge in the United States. In the course of their escape, many of these

individuals put themselves at further risk to ensure that U.S.-provided military equipment did not end up in Taliban hands, including by flying military aircraft out of Afghanistan.

6.      After urgently evacuating and then entering the United States through a special humanitarian parole program known as Operation Allies Refuge and later as Operation Allies Welcome, Asylee Plaintiffs sought and were granted asylum. Since then, they have found employment, productively integrated into United States society, applied for and, in some cases, obtained green cards, and begun rebuilding their lives with the expectation that their wives and children would soon join them through the follow-to-join pathway.

7.      Derivative Plaintiffs similarly made great sacrifices and faced dire consequences due to their family members' support of the United States. Left behind in Afghanistan, Derivative Plaintiffs have taken great efforts to avoid detection by the Taliban. They have faced life-threatening danger—from arrest and interrogation, to physical beatings, to being shot. The follow-to-join process is their only way out of immediate harm and to reunite with their husbands or fathers in the United States.

8.      Asylee Plaintiffs applied for their families (Derivative Plaintiffs) to join them in the United States by submitting Form I-730 Refugee/Asylee Petitions. U.S. Citizenship and Immigration Services ("USCIS") granted the Form I-730 Petitions well before the effective date of Proclamation 10949.

9.      Proclamation 10949 specifically states that it does not apply to individuals who have been granted asylum and that it should not be construed to limit the ability of any individual to seek asylum. Defendants have nonetheless unlawfully applied the Proclamation to prevent Asylee Plaintiffs from reuniting with their families in the United States. By misconstruing Proclamation 10949's text and contravening federal statutory law and the U.S. Constitution,

2

Defendants have impermissibly shut down the statutory follow-to-join path for Derivative Plaintiffs.

10.    To make matters worse, although Defendants have adopted a mandatory, non-discretionary policy and practice to refuse travel documents to derivative asylees based on Proclamation 10949, the State Department is still conducting consular interviews of families with follow-to-join petitions already approved by USCIS. Thus, certain Derivative Plaintiffs received interview notices from the State Department and, because there is no U.S. embassy in Afghanistan, embarked on dangerous, difficult, and expensive journeys to third countries attend their consular interviews. They did so even though the State Department's denial of travel documents evidently was preordained. The denials given to Derivative Plaintiffs came in the form of boilerplate letters—including one dated days *before* the family's interview took place and another with no date, no addressee, no case number, and no signature from the consular officer.

11.    In the wake of these preordained, unlawful denials, the wives and children of Afghan allies who have been granted asylum in the United States either are stuck in third countries like Pakistan where they have no independent resources or support and are subject to persecution, violence, and risk of deportation, or have returned to Afghanistan to face potential persecution based on their familial connection to individuals who assisted the United States and where their attempt to flee makes them even more of a target.[1] The increasing violence and recent border

---

[1] *See* Hope Hodge Seck, *Despite Taliban amnesty declaration, killings of US allies persist*, Military Times (Oct. 15, 2025), https://www.militarytimes.com/news/your-military/2025/10/15/despite-taliban-amnesty-declaration-killings-of-us-allies-persist/ (reporting that former U.S.-allied soldiers and security forces continue to be systematically hunted by the Taliban).

closures between Afghanistan and Pakistan only exacerbate an already dangerous situation for Plaintiffs.[2]

12.    Unless the unlawful application of Proclamation 10949 to derivative asylees is discontinued, Asylee Plaintiffs face two choices: stay in the United States and abandon their families, or abandon their asylum (and, for some, green cards) and leave the United States to rejoin their family in the country where they were (and would continue to be) persecuted. Both choices are inhumane and inconsistent with the asylum statute.

13.    For these reasons and those that follow, Plaintiffs request that the Court declare Defendants' policy and practice applying Proclamation 10949 to follow-to-join asylees as used to deny boarding foils to Derivative Plaintiffs unlawful and vacate the policy, void the denials of travel authorization to Derivative Plaintiffs based on the wrongful policy and practice, and enjoin Defendants from denying travel authorization to Derivative Plaintiffs who have not yet attended interviews on the basis of Proclamation 10949.

14.    Without intervention from this Court, Plaintiffs will remain separated from their immediate relatives—women and children in Afghanistan and Pakistan who rely on Asylee Plaintiffs for safety and support, and whose access to the follow-to-join process could be the difference between life and death.

## JURISDICTION AND VENUE

15.    This case arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*; and the Due Process Clause of the United States Constitution. This Court has subject matter jurisdiction pursuant to

---

[2] *See* Saeed Shah, Mohammad Yunus Yawar, & Mushtaq Ali, *Dozens killed in Pakistan-Afghanistan clashes, Border Closed*, Reuters (Oct. 12, 2025), https://www.reuters.com/world/asia-pacific/afghanistan-claims-58-pakistani-soldiers-killed-clashes-border-closed-2025-10-12/.

28 U.S.C. § 1331 (federal question). The Court has additional remedial authority under 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act).

16.     Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(e)(1) because Plaintiffs AA, EE, and FF are residents of the District. Defendants are agencies of the United States and the heads of those agencies. No real property is involved in this action.

17.     Venue is proper in the Alexandria Division under Local Civil Rule 3(B)–(C) because Plaintiff AA is domiciled in Fairfax County, Virginia, and Plaintiff FF is domiciled in Arlington County, Virginia.

## PARTIES

### I.     Plaintiffs

18.     Asylee Plaintiffs are Afghan asylees who were brought to the United States via Operation Allies Refuge, later known as Operation Allies Welcome, a multi-agency operation in which the United States evacuated thousands of at-risk Afghans following the United States' withdrawal from Afghanistan. After extensive vetting at U.S. military bases in Europe and the Middle East, Asylee Plaintiffs were granted humanitarian parole and brought into the United States so that they could avail themselves of our comprehensive asylum framework, including the process for bringing families to the United States as derivative asylees.

19.     Asylee Plaintiffs supported the United States' mission in Afghanistan. They trained with Americans, and they used American equipment to defend the American-aligned democratic government of Afghanistan. They fought the Taliban in partnership with and on behalf of the United States, including, for example, by protecting officials of the Afghan government and facilitating the detention of Al-Qaeda and Taliban militants. Their military missions in

coordination with the United States helped advance the goal of defeating the Taliban and promoting freedom and democracy in Afghanistan.

20.     Asylee Plaintiffs were not in a position to bring their spouses and children with them when they fled Afghanistan in the midst of the Taliban's capture of Kabul. After being granted asylum in the United States, Asylee Plaintiffs—as was their right—petitioned for derivative asylum for their wives and children to join them in the United States pursuant to 8 U.S.C. § 1158(b)(3), which USCIS granted. Asylee Plaintiffs now hold approved petitions for their spouses and children, Derivative Plaintiffs. But the State Department is unlawfully preventing Derivative Plaintiffs from traveling to the United States based on an erroneous application of Proclamation 10949.

21.     Each Asylee Plaintiff is discussed below, along with the associated Derivative Plaintiffs.

### A.    Plaintiffs AA and Family

22.     Asylee Plaintiff AA is an Afghan asylee living in Virginia.

23.     AA served in the Afghan Air Force from 2014 to 2021. He spent fifteen months in training funded by the U.S. government to fly three types of helicopters. He was one of the ten students selected from a group of 25 to join the 777th Special Mission Wing ("Unit 777"), Afghanistan's most elite helicopter unit. AA was then trained by U.S. Special Operations forces to fly the Mi-17 and UH-60 Blackhawk helicopters. AA holds thirteen certifications from the U.S. military.

24.     During his time with Unit 777, AA flew combat missions in coordination with the U.S. military. For example, in April 2019, AA flew a mission to recover the bodies of Afghan

special forces officers who had been killed by the Taliban. As AA attempted to land, his helicopter was hit by a Taliban-fired mortar, nearly killing him.

25.    Many of his fellow soldiers were even less fortunate. During a November 2020 mission in Helmand Province, AA watched as the Taliban shot down two of his team's helicopters. Eight of his friends died in front of his eyes.

26.    During a different mission, another four of AA's colleagues lost their lives when the Taliban downed their aircraft with an anti-tank guided missile.

27.    Four months later, while flying a mission to evacuate a group of Afghan Army special forces commandos surrounded by the Taliban in Maidan Wordak, AA landed his helicopter next to his teammates' aircraft that had just crashed while attempting the rescue. AA and his crew were shot at from multiple directions by the Taliban, and three of his crew members died.

28.    During a mission in June 2021, AA was flying a Blackhawk helicopter during a combat mission when one of his team's aircraft was shot down by the Taliban. AA landed his helicopter next to the downed aircraft to attempt to rescue its crew. AA and his team worked for more than twenty minutes under heavy fire from Taliban machine guns, rocket-propelled grenade launchers, and anti-tank guided missiles to try to save the aircraft's occupants, unfortunately unsuccessfully.

29.    As the Taliban offensive gained steam and the American withdrawal approached, AA and his colleagues were increasingly targeted by the Taliban and other terrorist groups. At least two of AA's pilot colleagues were assassinated while they were off duty.

30.    On August 14, 2021, the night before the Taliban took Kabul, AA was flying a mission to evacuate Afghan commandos from Taliban-controlled territory. He returned to his base at 7:00 a.m. on August 15, 2021, and went to sleep before the next evening's mission. He was

awoken by screaming that Kabul had fallen to the Taliban. On orders from superiors and U.S. advisors, AA and his colleagues flew their aircrafts into Uzbekistan to keep them out of the Taliban's hands, even though this meant leaving their families behind. AA's wife was three months pregnant at the time.

31.    AA was in Uzbekistan when he learned that the Taliban had gone to his home in an effort to find his family. Fortunately, AA's family had anticipated the danger and already moved to another location. AA's wife burned AA's belongings to avoid detection.

32.    AA was paroled into the United States in October 2021 as part of Operation Allies Welcome and granted asylum in the United States in October 2023.

33.    In August 2024, USCIS approved AA's Form I-730 Refugee/Asylee Relative Petitions for his wife and two children—Derivative Plaintiffs AA Spouse, AA Child 1, and AA Child 2—to join him in the United States as derivative asylees. But after securing a visa at great expense and traveling to Islamabad, Pakistan, for their interview on June 25, 2025, they were categorically denied entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. A.[3]

34.    AA's family continues to reside in Pakistan. They live in constant fear of deportation to Afghanistan, where they would face dangers from the Taliban regime. Their situation is especially dire given that Pakistan has launched a campaign to remove Afghans from the country (in the midst of the current hostilities between Pakistan and Afghanistan).[4]

---

[3] A redacted version of Exhibit A has been filed in the public record. The unredacted version of Exhibit A has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

[4] *See, e.g.*, *Afghan migrants report surge in forced deportations from Pakistan*, ANI (Sept. 5, 2025), https://www.aninews.in/news/world/asia/afghan-migrants-report-surge-in-forced-deportations-from-pakistan202509 05130555/; Rick Noack, *Afghans awaited U.S. resettlement. Pakistan sent them back to the Taliban*, Wash. Post (Oct. 5, 2025), https://www.washingtonpost.com/world/2025/10/05/pakistan-deports-afghan-refugees-taliban-resettlement/; Shah, Yawar, & Ali, *supra* note 2.

### B.    Plaintiffs BB and Family

35.    Asylee Plaintiff BB is an Afghan asylee living in Missouri.

36.    BB joined the Afghanistan Defense Ministry in 2006 as a soldier. Until the Taliban captured Kabul in 2021, BB worked as a mechanic with Afghan military convoys transporting weapons and injured or dead soldiers between various U.S. and Afghan bases. These convoys were frequently ambushed, and BB was responsible for fixing any vehicles disabled by the Taliban using rockets or mines. BB repaired the vehicles, often under heavy gunfire.

37.    During one such encounter, BB was shot in the hand and the foot and had to be medically evacuated for treatment.

38.    In another instance, BB was riding in a convoy vehicle with three of his colleagues that exploded from a mine placed in the road by the Taliban. He sustained serious damage to his wrist and face.

39.    During his time as an Afghan military mechanic, BB witnessed the deaths of many of his colleagues, some of whom died in his arms.

40.    When the Taliban seized Kabul, BB boarded a U.S. military flight to Dubai to escape because he knew the Taliban would kill him for working with the United States. Days after BB left Afghanistan, the Taliban went to his family home looking for him and any weapons. After finding nothing, they returned the next day to conduct a second search. When they did not find BB or any of his weapons, they began firing at his family. BB's son—Derivative Plaintiff BB Child 1—was hit and wounded by gunfire. BB's family fled their house and have not returned since.

41.    BB was paroled into the United States in October 2021 as part of Operation Allies Welcome and granted asylum in April 2024.

42.    In December 2024, USCIS approved BB's Form I-730 Refugee/Asylee Relative Petitions for his wife and six unmarried children—Derivative Plaintiffs BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, and BB Child 6—to join him in the United States as derivative asylees. To pay for their visas to travel to Dushanbe, Tajikistan for their interview, BB's family sold most of their belongings and rented out a level in their home. On August 7, 2025, BB's family attended an interview at the U.S. Embassy in Dushanbe, Tajikistan. They thought the interview went well because it lasted multiple hours and the consular officer processed updated photos of them for their visas. But at the end of the interview, the family was handed a boilerplate notice denying them entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. B.

43.    BB's family has been forced to return to Afghanistan and repurchase personal and home items to replace those they sold. The family of seven, which previously occupied two floors of their house, are now confined to the one floor of their house. They live in fear that the Taliban will discover they attempted to flee and will retaliate against them.

### C.    Plaintiffs CC and Family

44.    Asylee Plaintiff CC is an Afghan asylee and lawful permanent resident living in Illinois.

45.    CC served in multiple positions in the Afghan National Security Forces from 2013 to 2021. He received his training from NATO advisors, which included several Americans. After completing training, CC was stationed for five years with the Afghan National Army at a joint NATO military base that also housed American special forces. In this role, CC performed combat missions while shoulder-to-shoulder with American soldiers.

46.    CC witnessed the deaths of many of his Afghan colleagues by gunfire or IED explosions. For example, in 2013, one of CC's close friends was killed along with four others from CC's unit when their Humvee was blown up by the Taliban. The bodies were burned beyond recognition.

47.    After five years, CC transferred to the Afghan Air Force where he worked as an intelligence and security officer at the Kabul International Airport. In this role, he supported military helicopter units by providing intelligence regarding the Taliban's location and capabilities. He also checked documents and packages of individuals coming in and out of the airport to protect against attempts to smuggle bombs inside.

48.    CC was working at the airport when the Taliban seized Kabul on August 15, 2021. Though many fled the airport to escape the Taliban, CC and his unit remained. They had only a single aircraft left, which they boarded and flew to Uzbekistan to keep it out of the Taliban's hands. In so doing, he was forced to leave his family behind, including his pregnant wife and two young children. To this day, CC has never met his youngest child.

49.    Several of CC's colleagues who were not able to leave Afghanistan in time were arrested by the Taliban and CC has not heard from them since.

50.    After CC fled Afghanistan, the Taliban searched his family's home looking for weapons and for documents proving that CC worked with the United States. Although they did not find any there, the Taliban now has control of government records that show CC worked in the Army and Air Force with the Americans. His family lives in fear that the Taliban will return to arrest or kill them.

51.    CC was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in October 2023.

52.     In May 2024, USCIS approved CC's Form I-730 Refugee/Asylee Relative Petitions for his wife and three children—Derivative Plaintiffs CC Spouse, CC Child 1, CC Child 2, and CC Child 3—to join him in the United States as derivative asylees. Because Derivative Plaintiff CC Child 3, age three, was suffering from a congenital heart condition requiring specialized treatment and surgery, CC and his family requested and were granted an expedited interview to obtain their travel documentation before entering the United States.

53.     But after securing a Pakistani visa at great expense, traveling to Islamabad, Pakistan, and attending an interview with a U.S. consular officer on July 28, 2025, they were handed boilerplate letters dated 3 days *prior*, denying them entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. C.[5]

54.     The family has since returned to Afghanistan despite the dangers associated with having a family member who, like CC, served in the Afghan government. CC's family takes great care to keep a low profile and avoid the attention of the Taliban.

55.     CC Child 3 continues to suffer from a serious heart condition that will require surgery—a surgery he has not been able to get in Afghanistan.

### D.     Plaintiffs DD and Family

56.     Asylee Plaintiff DD is an Afghan asylee living in Maryland.

57.     DD served in the Afghan Air Force from 2017 to 2021 as an MD-530F attack helicopter pilot, logging more than 2,500 combat flight hours in support of U.S. and Afghan troops.

58.     Numerous times during his years of service, the Taliban attacked aircraft DD was flying. As one example, in late 2020 or early 2021, DD was shot in the upper leg when the Taliban attacked the helicopter he was co-piloting. The bullet penetrated the floor and passed through his

---

[5] A redacted version of Exhibit C has been filed in the public record. The unredacted version of Exhibit C has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

upper thigh, before continuing upward and almost hitting him below the chin. The damage to the helicopter forced an emergency landing at a nearby base. Not wanting his co-pilot to lose morale, DD kept the fact that he had been shot to himself until they landed the helicopter, at which point his shoes were filled with blood. DD was hospitalized for three days after this incident.

59.     One day before the fall of Kabul, DD flew a mission in northern Afghanistan to try to stop the Taliban from seizing the city of Mazar-i-Sharif and again came under fire from the Taliban. Upon landing at the city's airport, he and his teammates were told that the Taliban was about to capture Kabul and that it would no longer be safe to fly their helicopters back to their usual base.

60.     Determined to return to protect their families back in Kabul, DD and a group of his colleagues decided to fly a small plane back to Kabul. Nineteen people crowded into an eight-person Cessna.

61.     Upon takeoff, however, the Taliban shot at and hit the plane at least nine times, severely damaging the aircraft. Multiple passengers were injured. As they continued to attempt to fly the damaged plane, the pilots realized that they would not make it to Kabul in their current state. They made an emergency landing just over the border in Termez, Uzbekistan. That heartbreaking decision meant leaving their families in Kabul, at the mercy of the Taliban.

62.     Since DD fled Afghanistan, his family's home has been searched at least three times by the Taliban, who were looking for DD and weapons. During one of these searches, Taliban soldiers physically attacked DD's elderly father in an attempt to learn DD's whereabouts. His extended family ultimately was forced to relocate as a result of these ongoing threats to their safety.

63.     DD was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in November 2023.

64.     In September 2024, USCIS approved DD's Form I-730 Refugee/Asylee Relative Petitions for his wife and three children—Derivative Plaintiffs DD Spouse, DD Child 1, DD Child 2, and DD Child 3—to join him in the United States as derivative asylees. But after securing a visa at great expense and traveling to Islamabad, Pakistan, accompanied by DD's father (as is required under Taliban law), they were interviewed by a consular officer on July 7, 2025, after which they were denied entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. D.[6]

65.     Out of fear of returning to Afghanistan, DD's family continues to reside in Pakistan to this day. DD Spouse and her father-in-law cannot work under the visa they have, nor can the children attend school. Pakistan's recent effort to remove Afghans from the country (and the ongoing hostilities between the two countries) only add to the family's fears.

### E.    Plaintiffs EE and Family

66.     Asylee Plaintiff EE is an Afghan asylee living in Virginia.

67.     EE served in the Afghan Air Force from 2013 to 2021. He was trained for fifteen months in the Czech Republic by the U.S. military to fly a variety of aircraft, and in 2016 he began piloting American-provided military transport aircraft.

68.      EE flew soldiers to and from the front lines, often in dangerous situations and to or from areas controlled by the Taliban. He would transport dead and injured individuals from Taliban combat areas back to American-controlled air bases. The smell of dead bodies in his plane was sickening and is ingrained in his memory to this day, as is the memory of the injured men who died in his plane on the way to try to find medical treatment.

---

[6] A redacted version of Exhibit D has been filed in the public record. The unredacted version of Exhibit D has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

69.     When Kabul fell to the Taliban on August 15, 2021, EE was on duty at the Kabul International Airport. The Taliban had the facility surrounded and the American military was trying to hold the perimeter. He and his colleagues made the decision to fly their U.S.-supplied aircraft to Tajikistan to keep it away from the Taliban. EE was forced to leave behind his child and his wife, who was pregnant at the time. To this day, EE has never met his youngest child.

70.     After EE fled Afghanistan, the Taliban searched his family's home.

71.     EE was paroled into the United States in March 2022 as part of Operation Allies Welcome and was granted asylum in August 2023.

72.     In July 2024, USCIS approved EE's Form I-730 Refugee/Asylee Relative Petitions for his wife and two children—Derivative Plaintiffs EE Spouse, EE Child 1, and EE Child 2—to join him in the United States as derivative asylees. Eager to escape Afghanistan and get to the United States, the family secured six-month visas at great expense and traveled to Islamabad, Pakistan in November 2024 to await their interview. The interview was initially scheduled for February 25, 2025, but then postponed to June 13, 2025. EE's family was categorically denied entry into the United States based on the unlawful application of Presidential Proclamation 10949. *See* Ex. E.[7]

73.     EE's family continues to reside in Pakistan under the threat of deportation to Afghanistan, where the Taliban will target them for their association with EE and for attempting to flee.

---

[7] A redacted version of Exhibit E has been filed in the public record. The unredacted version of Exhibit E has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

### F.    Plaintiffs FF and Family

74.    Asylee Plaintiff FF is an Afghan asylee and lawful permanent resident living in Virginia.

75.    FF worked from 2003 to 2021 as a special agent in the protective details of former Presidents of Afghanistan Hamid Karzai and Ashraf Ghani. He was part of the first class of protective agents trained by the United States. Over the years, FF traveled with the Presidents of Afghanistan to over thirty countries, including twice to the United States to meet with U.S. government officials, and successfully protected Presidents Karzai and Ghani from multiple assassination threats.

76.    In August 2021, the Taliban reached the outskirts of the city of Kabul, where FF and his family lived. Because FF was known to the Taliban for having worked with the United States and the democratic government of Afghanistan, he faced mortal danger if he were to remain in Kabul when the Taliban captured it. For that reason, FF boarded a U.S. military plane destined for an American base in Qatar. Unfortunately, FF had to leave his wife and five children behind, and they remain in Afghanistan to this day.

77.    After FF fled the country, the Taliban raided his family's home and arrested and interrogated his eldest son.

78.    FF was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in November 2023.

79.    In June 2024, USCIS approved FF's Form I-730 Refugee/Asylee Relative Petitions for his wife and five children—Derivative Plaintiffs FF Spouse, FF Child 1, FF Child 2, FF Child 3, FF Child 4, and FF Child 5—to join him in the United States as derivative asylees. They now await an interview, at which point they will have to secure Pakistani visas at great expense and

16

travel to Islamabad, Pakistan, for an interview, knowing they will be summarily denied entry into the United States based on the unlawful application of Presidential Proclamation 10949.

80.     FF's family continues to face grave danger as a result of his service to the United States and the democratic government of Afghanistan. FF's children rarely leave the house for fear that the Taliban will arrest them, as they did FF's eldest son. As a result of these ongoing risks and continued separation from her husband, FF's wife has experienced depression and suicidal thoughts.

### G.    Plaintiffs GG and Family

81.     Asylee Plaintiff GG is an Afghan national and a lawful permanent resident living in Michigan.

82.     GG first worked in the Bagram Airfield Division Military Police section of Bagram Airbase at a power plant powering Parwan Detention Facility, which was Afghanistan's main military prison, housing members of the Taliban and Al Qaeda, including senior leaders of those groups. During his employment there, GG narrowly escaped death after his vehicle was targeted in a terrorist attack, killing one of GG's colleagues.

83.     Shortly thereafter, a former colleague who had been laid off began to harass and threaten GG. The colleague implied that, if GG did not help him get his job back, the Taliban would harm him.

84.     In December 2020, GG left his job at Parwan and began working as an aircraft mechanic at Kabul International Airport.

85.     On August 15, 2021, Kabul and Bagram Air Base fell to the Taliban. One of the first things the Taliban did was release thousands of prisoners from Parwan, many of whom knew about GG's work there.

86.     Fearing for his life when the Taliban took power, GG made the agonizing decision to board a plane without his wife, evacuating Afghanistan on August 16, 2021.

87.     GG was paroled into the United States in October 2021 as part of Operation Allies Welcome and was granted asylum in March 2024.

88.     In May 2025, USCIS approved GG's Form I-730 Refugee/Asylee Relative Petition for his wife, Derivative Plaintiff GG Spouse, to join him in the United States as a derivative asylee. She now awaits an interview, at which point she will have to secure a Pakistani visa at great expense, find a male family member to accompany her, and travel to Islamabad, Pakistan, from Afghanistan in the middle of armed conflict between the countries for an interview, knowing she will be denied entry into the United States based on the unlawful application of Presidential Proclamation 10949.

## II.     **Defendants**

89.     Defendant U.S. Department of State is the executive agency of the United States that facilitates the processing of approved derivative asylees on behalf of USCIS when USCIS does not have an overseas office located in a given country. The State Department determines whether a derivative asylee is eligible to travel to the United States but does not adjudicate follow-to-join Form I-730 Refugee/Asylee Relative Petitions, which are under the purview of USCIS.

90.     Defendant Marco Rubio is the Secretary of State and is responsible for overseeing the State Department's management of final processing for approved derivative asylees. He is also responsible for overseeing the enforcement and implementation of executive orders and presidential proclamations by all State Department staff. He is sued in his official capacity.

91.    Defendant U.S. Department of Homeland Security ("DHS") is the executive agency of the United States with authority to adjudicate and process affirmative asylum applications, including follow-to-join petitions.

92.    Defendant Kristi Noem is the Secretary of Homeland Security and is responsible for overseeing DHS's management of the derivative asylee process. She is also responsible for overseeing enforcement and implementation of relevant executive orders and proclamations by all DHS staff. She is sued in her official capacity.

93.    Defendant USCIS is the agency within DHS that adjudicates Form I-730 Refugee/Asylee Relative Petitions.

94.    Defendant Joseph B. Edlow is the Director of USCIS and is responsible for overseeing USCIS's management of the derivative asylee process. He is also responsible for overseeing enforcement and implementation of relevant executive orders and proclamations by all USCIS staff. He is sued in his official capacity.

95.    Defendant United States of America is responsible for the exercise of executive action by the other named Defendants.

## FACTUAL BACKGROUND

### I.    The Immigration and Nationality Act

96.    Under Article I of the U.S. Constitution, the power to make immigration laws "is entrusted exclusively to Congress." *Galvan v. Press*, 347 U.S. 522, 531 (1954); *see also* U.S. Const. art. I, § 8, cl. 4.

97.    Pursuant to this authority, Congress enacted the INA, 8 U.S.C. § 1101 *et seq.*, a comprehensive statutory scheme to regulate immigration. The INA empowers specific federal agencies to enforce and administer immigration laws.

98.     Section 208 of the INA provides: "The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A).

99.     Section 208 of the INA also entitles asylees to seek asylum for their spouses and children based on their derivative relationship: "A spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien." 8 U.S.C. § 1158(b)(3).

100.    Thus, by law, an asylee's spouse and children are eligible for the same status as the principal asylee through the "derivative" or "follow-to-join" asylum process. *See id.*; 8 C.F.R. § 208.21. The mechanism for doing so is to file a Form I-730 Refugee/Asylee Relative Petition.

## II.     The Derivative Asylum Process

101.    The derivative asylum process is governed by the INA, implementing regulations, USCIS's Policy Manual, and the State Department's Foreign Affairs Manual ("FAM").

102.    USCIS's Policy Manual is the agency's centralized online repository for USCIS's immigration policies. The Policy Manual contains the "official policies of USCIS" and "is to be followed by all USCIS officers in the performance of their duties." USCIS, Policy Manual, https://www.uscis.gov/policy-manual (last visited Oct. 18, 2025).

103.    The FAM is "a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the

State Department, the Foreign Service and, when applicable, other federal agencies." U.S. Dep't of State, FAM/FAH Search, https://fam.state.gov/ (last visited Oct. 18, 2025). Volume 9 of the FAM provides extensive guidance for processing visa and non-visa travel to the United States, and Section 203 in particular provides guidance on processing petitions for derivative asylees.

### A. USCIS's Adjudication of Form I-730 Refugee/Asylee Relative Petitions

104. As a matter of law, authority to adjudicate and process affirmative asylum applications, including petitions for derivative asylees, rests exclusively with DHS. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.21(d); 9 FAM 203.3-4(a)(1), 203.5-3(a)(1).

105. The component of DHS designated to administer the derivative asylum process is USCIS. 8 C.F.R. § 208.21(d); 9 FAM 203.5-3(a)(2).

106. After an individual is granted asylum in the United States, he or she may petition for their spouse and children to receive asylee status by filing Form I-730 Refugee/Asylee Relative Petitions for each beneficiary with USCIS. 9 FAM 203.5-1(c)(2); 9 FAM 203.5-4(a); *see also* 8 U.S.C. § 1158(b)(3)(A); 8 C.F.R. § 208.21(d).

107. USCIS adjudicates the Form I-730 petition based on criteria set out in INA Section 208 and USCIS's own regulations.

108. The spouse or child of a principal asylee with an approved Form I-730 Refugee/Asylee Relative Petition is referred to as a "follow[]-to-join asylee" or a "Visas 92" or "V92" beneficiary. 9 FAM 203.5-1(c)(1).

109. Upon approval of the petition, USCIS informs the petitioner (the principal asylee) via written notice that it has "approved" the petition "in accordance with Section 208 of the Immigration and Nationality Act" and has forwarded it to the Department of State National Visa Center. The notice further states that "USCIS action" on the petition is "complete."

21

### B.    State Department's Travel Eligibility Determination

110.    The State Department performs certain services on behalf of DHS and USCIS "to facilitate [follow-to-join asylum] case processing abroad and to verify the eligibility of the approved beneficiaries, but not for adjudication of the Form I-730 petition." 9 FAM 203.5-3(a)(5).

111.    It is USCIS's policy that, for a beneficiary overseas in a country without a USCIS international field office presence such as Afghanistan, USCIS first approves the Form I-730 Petition, then forwards it to the State Department for the travel eligibility determination. *See* USCIS Policy Manual, Vol. 4, Part C. Ch. 5.

112.    The State Department receives the approved Form I-730 Petition at the State Department's National Visa Center, which manually creates a record of the case in the Immigrant Visa Information System, using the YY category for Visas 92. 9 FAM 203.5-4(f). The "Visas 92" or "V92" category is distinct from the categories for immigrant and non-immigrant visas.

113.    The National Visa Center forwards the hard copy of the V92 file, including the approved Form I-730 Petition, "to the U.S. Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located." 8 C.F.R. § 208.21(d); *see also* USCIS Policy Manual, Vol. 4, Part C. Ch. 5.

114.    Because the United States closed its embassy in Afghanistan following the Taliban takeover, interviews of Afghan follow-to-join beneficiaries are conducted at U.S. embassies in third countries.[8]

---

[8] As of November 1, 2025, Afghan nationals will generally only be interviewed at the U.S. Embassy in Islamabad, Pakistan. *See* Adjudicating Immigrant Visa (IV) Applicants in Their Country of Residence, U.S. State Dep't, https://travel.state.gov/content/travel/en/News/visas-news/adjudicating-iv-applicants-in-their-country-of-residence.html (last updated Oct. 10, 2025).

115.    Upon receiving the approved Form I-730 Petition, the receiving embassy or consulate will then contact the beneficiary to schedule an interview.

116.    Before the interview, a consular officer annotates the beneficiary's V92 file with the language: "Not a visa. Foil prepared at DHS request." 9 FAM 203.5-6(a)(4)–(5). The consular officer then "interviews and completes processing of the beneficiary on USCIS' behalf and determines the beneficiary's eligibility to travel to the United States." USCIS Policy Manual, Vol. 4, Part C, Ch. 5.

117.    Although State Department consular officers conduct the interview, they are not permitted to re-adjudicate a Form I-730 Petition already approved by USCIS. *See* 9 FAM 203.5-3(a)(1)–(2). Instead, their involvement is limited to conducting an individualized determination of a derivative asylee's eligibility to travel based on their identity, their qualifying relationship with the principal asylee, and any statutory bars or grounds of inadmissibility. *See* 9 FAM 203.5-7.

118.    Specifically, it is the State Department's policy that a derivative asylee is "eligible" to travel to the United States if they (1) can "establish their identity and a qualifying relationship with the asylee" and (2) are not "subject to any bars, or inadmissibilities, or reasons for denial of their case, unless such issues have been satisfactorily resolved." 9 FAM 203.5-2(a); *see id.* 203.5-7(a)(1).

119.    The grounds of inadmissibility applicable to immigrants and nonimmigrants specified in INA Section 212(a) expressly "do not apply to" follow-to-join beneficiaries. 9 FAM 203.5-9(b)(1). Follow-to-join beneficiaries instead are only subject to the specific bars to asylum found in INA Section 208(b)(2)(A)(i)–(v). *Id.*

120.    The bars and grounds of inadmissibility applicable to derivative asylees are listed at 8 U.S.C. § 1158(b)(2)(A)(i)–(vi):

     i.    the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;

    ii.    the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States;

   iii.    there are serious reasons for believing that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States;

   iv.    there are reasonable grounds for regarding the alien as a danger to the security of the United States;

    v.    the alien [engaged in certain terrorist activity]; and

   vi.    the alien was firmly resettled in another country prior to arriving in the United States.

121.    If no bars or grounds of inadmissibility apply, the State Department also assesses whether there is "derogatory information" about the specific derivative asylee that is "egregious" and outweighs other "positive factors," such that a discretionary denial might be warranted. 9 FAM 203.5-9(b)(12); *see id.* 203.5-7(a). Justifications for requesting a discretionary denial from USCIS include things like "communicable disease of public health significance"; "physical or mental disorder" that poses a threat to the safety of the individual or others; "[c]riminal convictions"; "[v]iolation of any law or regulation relating to a controlled substance"; "[e]vidence of moral depravity"; "[i]nstances of immigration fraud"; and the "presence of other evidence indicative of the individual's bad character." 9 FAM 203.5-9(b)(12). Such discretionary denials are "extremely rare," 9 FAM 203.5-9(12)(c), and require "specific, verifiable, and concrete information or evidence" about the individual, *id.* 203.5-17(e).

122.    If a consular officer determines that a bar or ground of inadmissibility applies to a derivative asylee, or that a discretionary denial may be appropriate, the officer must refuse to issue travel documentation under INA § 221(g) and return the case to USCIS for further action with an

24

explanation of why the officer believes a discretionary denial is warranted. 9 FAM 203.5-9(10), 203.5-10(1)–(2).

123.    Similarly, if consular officers uncover information during case processing that suggests USCIS should not have approved a Form I-730 Petition, the FAM instructs consular officers to return the case via the National Visa Center to the appropriate USCIS office for further action. 9 FAM 203.5-3(a)(5).

124.    Consular officers, and the State Department more generally, lack authority or discretion to make any decisions on derivative asylum status.

125.    If a bar, ground of inadmissibility, or discretionary reason for denial does not apply to a derivative asylee, the FAM directs that the asylee is, at that point, "approved to travel." 9 FAM 203.5-15(a).

126.    The State Department does not have authority or discretion to deny travel documentation to a derivative asylee who is not subject to a bar, inadmissibility, or discretionary reason for denial, and who is, therefore, eligible and "approved to travel."

127.    If a beneficiary is found to be eligible to travel to the United States, they receive a "boarding foil" in a passport or other travel document authorizing them to board a flight and enter the United States. 9 FAM 203.5-15(c)–(d).

128.    Upon entry into the United States, beneficiaries obtain all the benefits afforded to asylees, including employment authorization, and are eligible to apply for lawful permanent residency after one year.

## III.    Relevant Executive Actions

129.    Over the course of President Trump's first term and the first nine months of his second term, he has issued several presidential proclamations and executive orders restricting the

admission and entry of certain groups of foreign nationals pursuant to 8 U.S.C. § 1182(f). A timeline of the relevant proclamations and executive orders is outlined below.

### A.      Executive Order 13780 (2017)

130.      On March 6, 2017, President Trump issued Executive Order 13780, "Protecting the Nation From Foreign Terrorist Entry Into the United States." EO 13780 suspended the entry of nationals from six countries for ninety days. 82 Fed. Reg. 13209, 13213 (Mar. 6, 2017).

131.      EO 13780 stated that it "shall not apply to an individual who has been granted asylum" and that it "shall [not] be construed to limit the ability of an individual to seek asylum." *Id.* at 13218.

132.      On June 28, 2017, the State Department adopted a policy that EO 13780 did not apply to derivative asylees. Quinta Jurecic, *State Department Cable on Implementing Travel Ban Executive Order*, Lawfare (June 29, 2017), https://www.lawfaremedia.org/article/state-department-cable-implementing-travel-ban-executive-order (last visited Oct. 18, 2025).

### B.      Presidential Proclamation 9645 (2017)

133.      On September 24, 2017, President Trump issued Proclamation 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats." Proclamation 9645 suspended and limited "the immigrant and nonimmigrant entry into the United States" of nationals of eight countries. 82 Fed. Reg. 45161, 45165–67 (Sept. 24, 2017).

134.      Proclamation 9645 contained identical language to EO 13780 that it "shall not apply to an individual who has been granted asylum," and that it "shall [not] be construed to limit the ability of an individual to seek asylum." *Id.* at 45171.

135.    The State Department adopted a policy that Proclamation 9645 did not apply to derivative asylees and affirmed this policy multiple times, including on or around December 4, 2017, April 10, 2018, and June 26, 2018.[9]

### C.    Presidential Proclamation 10949 (2025)

136.    Four and a half months into his second term in office, on June 4, 2025, President Trump issued Proclamation 10949 titled "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats." 90 Fed. Reg. 24497 (June 4, 2025).

137.    Proclamation 10949 "fully restrict[s] and limit[s] the entry of nationals" of twelve countries, including Afghanistan. *Id.* at 24499.

138.    The stated policies and purposes of the travel restrictions announced in Proclamation 10949 are to "protect [U.S.] citizens from terrorist attacks" by preventing "exploitation of our visa system." *Id.* at 24497–98.

139.    With certain exceptions, Proclamation 10949 suspends entry of Afghan nationals into the United States because:

> The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exist Overstay Report ("Overstay Report"), Afghanistan had a business/tourist (B-1/B-2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

---

[9] "New Court Order on Presidential Proclamation" (Dec. 4, 2017), https://web.archive.org/web/20171208120811/https://travel.state.gov/content/travel/en/traveladvisories/ea/new-court-orders-on-presidential-proclamation.html (last visited Oct. 18, 2025); "Revisions to Presidential Proclamation 9645" (Apr. 10, 2018), https://web.archive.org/web/20180413101610/https://travel.state.gov/content/travel/en/traveladvisories/ea/revisions-to-presidential-proclamation-9645.html (last visited Oct. 18, 2025); "June 26 Supreme Court Decision on Presidential Proclamation 9645," https://web.archive.org/web/20180718121421/https://travel.state.gov/content/travel/en/News/visas-news/june_26_supreme_court_decision_on_presidential_proclamation9645.html (last visited Oct. 18, 2025).

*Id.* at 24499.

140.    Like President Trump's prior executive actions, Proclamation 10949 states that it "shall not apply to an individual who has been granted asylum" and that it "shall [not] be construed to limit the ability of an individual to seek asylum." *Id.* at 24504.

141.    Proclamation 10949 also states that "[e]xceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest." This is known as a National Interest Exception or "NIE." *Id.* at 24503.

142.    On June 6, 2025, the State Department sent a cable to all diplomatic and consular posts worldwide, instructing officials how to implement Proclamation 10949. *See Thein v. Trump*, 2025 WL 2418402, at *3 (D.D.C. Aug. 21, 2025). The State Department has not shared the contents of these instructions publicly.

143.    On June 7, 2025, the State Department announced a new policy that it would be "fully suspending visa issuance to nationals of Afghanistan . . . for all nonimmigrant and immigrant visa categories" pursuant to Proclamation 10949.[10]

144.    The State Department further stated that "[v]isa applicants who are subject to th[e] Presidential Proclamation may still submit visa applications and schedule interviews, but they may be ineligible for visa issuance or admission to the United States."[11]

---

[10] Suspension of Visa Issuance to Foreign Nationals to Protect the United States from Foreign Terrorists and other National Security and Public Safety Threats, U.S. State Dep't, https://travel.state.gov/content/travel/en/News /visas-news/suspension-of-visa-issuance-to-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats.html (last updated June 7, 2025) (emphasis omitted).

[11] *Id.* (emphasis omitted).

145.    The State Department's announcement of this new policy did not address derivative asylees or boarding foils.

146.    On June 9, 2025, at 12:01 a.m. EDT, Proclamation 10949 took effect. 90 Fed. Reg. at 24504.

147.    On information and belief, after Proclamation 10949 took effect, and continuing to the present, the State Department adopted a final policy to categorically deny boarding foils to derivative asylees from the countries listed in Proclamation 10949.

148.    The State Department has neither explained the reason for this policy and practice nor publicly announced it, even though it is a reversal from all prior practice, including under the prior presidential orders restricting entry to the United States.

149.    The State Department's Consular Affairs Visa Office confirmed its position in response to a congressional inquiry in August 2025, explaining that it is applying Proclamation 10949 to "Following-to-Join Asylee V92/YY beneficiaries from suspended countries."

150.    More recently, however, the State Department has refused to acknowledge any responsibility for this decision, stating in response to a congressional inquiry in late September 2025 that questions about boarding foil refusals for I-730 beneficiaries are better addressed to DHS.

151.    What's more, on or around August 22, 2025, the State Department issued letters en masse categorically denying travel documents to family members of Afghan asylees with approved Form I-730 Petitions who had already interviewed with consular officers. These letters were seemingly sent irrespective of whether a prior denial letter had already been issued in a specific family's case. *See, e.g.*, Exs. A, D, F, H.

152.    Even though Proclamation 10949—like EO 13780 and Proclamation 9645 before it—expressly exempts asylees and expressly is not to be construed to limit individuals' ability to seek asylum, the State Department's policy bars entry of asylum-holders' follow-to-join family members whose Form I-730 Petitions already have been approved, meaning these family members are already derivative asylees or, at the very least, are seeking asylum.

153.    The State Department has executed this policy by interviewing approved derivative asylees at embassies, then denying travel eligibility after the interview via a generic notice with this or substantially similar text:

Dear Applicant:

This is to inform you that a consular officer found you ineligible under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation "Restricting the Entry of foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats". Today's decision cannot be appealed.

Taking into account the provisions of the Proclamation, a National Interest Exception (NIE) will not be granted in your case.

154.    On certain occasions, the letter is dated before the interview ever took place.

155.    On other occasions, the letter contains no date, no addressee, no case number, and no signature from a consular officer.

156.    In sum, embassies are conducting interviews knowing that they will categorically, and as a matter of State Department policy, deny entry without regard to the families' qualifications and their USCIS-approved petitions for derivative asylum.

30

IV.     **State Department's Refusal to Issue Boarding Foils to Approved I-730 Beneficiaries**

A.     **Plaintiffs AA and Family**

157.    In December 2023, AA submitted Form I-730 Petitions to USCIS for his wife and two children to become derivative asylees and join him in the United States. USCIS approved the petitions in August 2024—ten months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad.

158.    AA's family—AA Spouse, AA Child 1, and AA Child 2—was scheduled for an interview on June 9, 2025, but the U.S. Embassy in Islamabad postponed the interview until June 25, 2025, because of the Eid holiday.

159.    AA's family secured a Pakistani business visa at considerable expense, traveled to Islamabad in late May 2025, received their required medical examinations, and attended their scheduled interview on June 25, 2025. They were accompanied by AA's uncle because the Taliban does not allow women to travel without an adult male family member.

160.    At the end of the interview, AA's family members were handed paperwork saying their case was in administrative processing, which is an additional, temporary review of an application. Ex. F.[12] They later received a letter on State Department letterhead, dated August 22, 2025, stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. A.

---

[12] A redacted version of Exhibit F has been filed in the public record. The unredacted version of Exhibit F has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

### B.    Plaintiffs BB and Family

161.    In June 2024, BB submitted Form I-730 Petitions to USCIS for his wife and six unmarried children to become derivative asylees and join him in the United States. USCIS approved the petitions in December 2024 and forwarded them to the U.S. embassy in Dushanbe, Tajikistan. On May 28, 2025—a week before Proclamation 10949 was even announced—the embassy informed the family that their interview would take place on August 7, 2025.

162.    BB's family—BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, and BB Child 6—secured visas at considerable expense, traveled to the U.S. Embassy in Dushanbe, received their required medical examinations, and attended their interview with the State Department on August 7, 2025.

163.    After a four-hour interview, which left BB's family under the impression that they would be given boarding foils to travel to the United States, they were handed a letter stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. B. The letter that BB's family received was so pro forma that it contained no date, no addressee, no case number, and no signature from a consular officer.

### C.    Plaintiffs CC and Family

164.    In January 2024, CC submitted Form I-730 Petitions to USCIS for his wife and three children to become derivative asylees and join him in the United States. USCIS approved the petitions in May 2024—thirteen months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad, Pakistan.

165. CC's three-year-old child—Plaintiff CC Child 3—was later diagnosed with a congenital heart condition, which requires specialized treatment and surgery.

166. CC's family—CC Spouse, CC Child 1, CC Child 2, and CC Child 3—secured a Pakistani visa at considerable expense, traveled to the U.S. Embassy in Islamabad, received their required medical examinations, and attended their scheduled interview on July 28, 2025.

167. At the end of the interview, CC's family was handed letters on State Department letterhead, dated three days *before* the interview, which stated: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. C.

168. Later, CC's family received a second letter on State Department letterhead dated August 22, 2025, stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. G.[13]

**D.  Plaintiffs DD and Family**

169. In December 2023, DD submitted Form I-730 Petitions to USCIS for his wife and three children to become derivative asylees and join him in the United States. USCIS approved the petitions in September 2024—nine months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad. On May 28, 2025—a week before Proclamation 10949 was announced—the embassy informed the family that their interview would take place on July 7, 2025.

---

[13] A redacted version of Exhibit G has been filed in the public record. The unredacted version of Exhibit G has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

170.    After Presidential Proclamation 10949 was issued, DD's counsel emailed the U.S. Embassy in Islamabad to confirm that the family's interview would still go forward. The embassy informed counsel that the interview would proceed.

171.    Based on that assurance, DD's family—DD Spouse, DD Child 1, DD Child 2, and DD Child 3—secured Pakistani business visas at considerable expense, traveled to Islamabad in late June 2025, received their required medical examinations, and attended their interview with the State Department on July 7, 2025. They were also accompanied by DD's father because the Taliban does not allow women to travel without an adult male family member.

172.    A week before the interview, DD's counsel emailed the embassy to request a National Interest Exception permitting the family to travel to the United States.

173.    At the end of the interview, the consular officer said nothing to DD Spouse or the rest of the family about Proclamation 10949.

174.    After the interview, the embassy emailed DD's counsel a letter on State Department letterhead stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]." Ex. H.[14] The letter also advised: "The State Department is reviewing your case to determine whether to grant a National Interest Exception (NIE) under the Proclamation . . . . [U]nless the State Department determines your travel would serve a U.S. national interest and grants an NIE, your visa application will remain refused under Section 212(f)." *Id.*

175.    In anticipation of receiving a National Interest Exception, DD's family remained in Pakistan following the July 7 interview. But in a letter dated August 22, 2025, the embassy informed DD and his family that "[t]aking into account the provisions of the Proclamation, a

---

[14] A redacted version of Exhibit H has been filed in the public record. The unredacted version of Exhibit H has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

National Interest Exception (NIE) will not be granted in your case." Ex. D. The family remains in Pakistan, afraid to return to Afghanistan.

### E.    Plaintiffs EE and Family

176.    In September 2023, EE submitted Form I-730 Petitions to USCIS for his wife and two children to become derivative asylees and join him in the United States. USCIS approved the petitions in July 2024—twelve months before Proclamation 10949 took effect—and forwarded them to the U.S. Embassy in Islamabad. The interview was originally scheduled for February 13, 2025—four months before Proclamation 10949 was even announced. But on February 5, 2025, EE received a notice from the U.S. Embassy in Islamabad that their interview had been postponed. On May 22, 2025—two weeks before Proclamation 10949 was even announced—EE's family finally received a notice that their interview had been rescheduled for June 13, 2025—mere days after Proclamation 10949 went into effect.

177.    EE's family—EE Spouse, EE Child 1, and EE Child 2—secured a Pakistani business visa at considerable expense, crossed into Pakistan with a male chaperone, traveled to the U.S. Embassy in Islamabad, received their required medical examinations, and attended their scheduled interview on June 13, 2025.

178.    Immediately at the end of the interview, EE's family was handed a pre-typed form on State Department letterhead stating that their visas had been refused and their case placed into "administrative processing." Ex. I.[15] Unlike Derivative Plaintiffs, who received outright denials of their boarding foils, upon information and belief, EE's family was placed into administrative

---

[15] A redacted version of Exhibit I has been filed in the public record. The unredacted version of Exhibit I has been filed under seal, pursuant to the accompanying Motion to Seal Identifying Documents.

processing, presumably because their interview occurred only four days after Proclamation 10949 took effect and the State Department was still finalizing its unlawful policy.

179.    On September 3, 2025, EE's family received a second letter on State Department letterhead dated August 22, 2025, stating: "a consular officer found you ineligible for an immigrant visa under Section 212(f) of the Immigration and Nationality Act, pursuant to Presidential Proclamation [10949]" and "a National Interest Exception (NIE) will not be granted in your case." Ex. E.

### F.    Plaintiffs FF and Family

180.    In December 2023, FF submitted Form I-730 Petitions for his wife and five children to become derivative asylees and join him in the United States. USCIS approved the petitions in June 2024—thirteen months before Proclamation 10949 took effect—and forwarded them to the National Visa Center.

181.    As of the filing of this Complaint, FF's family—FF Spouse, FF Child 1, FF Child 2, FF Child 3, FF Child 4, and FF Child 5—is still waiting in Afghanistan to receive an interview notice from the U.S. Embassy in Islamabad.

182.    Once their interview is scheduled, FF's family will incur significant time, costs, and risk to obtain proper visas and travel to Islamabad to attend their interview, after which it is a foregone conclusion that FF's family will be refused boarding foils on the basis of the State Department's unlawful policy and practice implementing Presidential Proclamation 10949 to bar entry to Afghan derivative asylees.

### G.    Plaintiffs GG and Family

183.    In July 2024, Plaintiff GG submitted a Form I-730 Petition for his wife to become a derivative asylee and join him in the United States. USCIS approved the petition in May 2025 and forwarded it to the National Visa Center.

184.    As of the filing of this Complaint, GG's wife—GG Spouse—is still waiting in Afghanistan to receive an interview notice from the U.S. Embassy in Islamabad.

185.    Once her interview is scheduled, GG Spouse will incur significant time, costs, and risk to obtain proper visas and travel to Islamabad to attend her interview. She will have to find a male guardian to accompany her on the trip. And after GG Spouse is interviewed, it is a foregone conclusion that she will be refused a boarding foil on the basis of the State Department's unlawful policy and practice implementing Presidential Proclamation 10949 to bar entry to Afghan derivative asylees.

186.    After that, GG Spouse will eventually have to return to a country where the inmates previously detained at the facility at which her husband used to work are now free and, in some cases, even hold positions in the new Taliban government.

### V.    Imminent and Ongoing Harm to Plaintiffs

187.    The State Department's application of Proclamation 10949 to derivative asylees upends the statutory benefits of asylum, including by foreclosing the pathway to derivative status for asylees' family members imposed by Congress; denies Plaintiffs the benefit of family reunification that they have already been granted; forces Plaintiffs to incur significant time, costs, and risks to attend an entirely futile interview; and puts Derivative Plaintiffs in significant danger of further persecution, torture, degrading and inhumane treatment, or even death.

188.    Plaintiffs have been injured, or face an impending injury or a non-speculative substantial risk of future injury, as a result of the State Department's erroneous and unlawful application of Proclamation 10949 to derivative asylees.

189.    The State Department's unlawful policy and practice has already been applied to refuse boarding foils to Derivative Plaintiffs AA Spouse, AA Child 1, AA Child 2, BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, BB Child 6, CC Spouse, CC Child 1, CC Child 2, CC Child 3, DD Spouse, DD Child 1, DD Child 2, DD Child 3, EE Spouse, EE Child 1, and EE Child 2 (not to mention other derivative asylees who have been interviewed and denied since June 9, 2025). These Derivative Plaintiffs made long, expensive, and dangerous journeys to attend their interviews, and the families of AA, DD, and EE must now choose between two evils: remaining in Pakistan, where they will face discrimination, abuse, violence, and possibly deportation because of their nationality, or else voluntarily return to Afghanistan, where they will have a target on their backs and be at risk of violent retaliation by the Taliban government. The families of BB and CC have already returned to Afghanistan and live in constant fear of detection by the Taliban.

190.    Although FF Spouse, FF Child 1, FF Child 2, FF Child 3, FF Child 4, FF Child 5, and GG Spouse have not yet been interviewed, it is a foregone conclusion that the State Department will apply the same policy and practice to similarly deny them boarding foils. They will have to undergo the same timely, costly, and otherwise difficult journey that other Plaintiffs engaged in, knowing that the only outcome of their interviews will be certain denial, at which point they too will have to decide between staying in limbo in Pakistan or returning to live under mortal threat in Afghanistan.

191.    To avoid the consequences of appearing for a futile interview that all agree would end in denial, FF's and GG's families have only one other option upon receiving their interview notice: choose not to appear for the interview. Doing so could eventually lead to administrative closure of their cases. *See* 9 FAM 203.5-6(b). And the failure to appear would amount to a concession that their families will not be reunited in the United States.

192.    The State Department's actions have forced Asylee Plaintiffs to choose between three devastating options: (1) risk the safety of their family and attend the interviews at great time and expense, after which they inevitably will be denied entry under the State Department's unlawful policy and practice; (2) remain in the United States and accept that they may never be reunited with their family; or (3) return to Afghanistan to be reunited with their families, but face the same mortal danger that led them to flee Afghanistan and obtain asylum in the United States in the first place.

**CLAIMS FOR RELIEF**

**CLAIM ONE**
**Administrative Procedure Act**

193.    The foregoing allegations are repeated and re-alleged as though fully set forth herein.

194.    The APA requires courts to hold unlawful and set aside any agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or made without observance of procedure required by law. 5 U.S.C. § 706(2)(A)–(D).

195.    DHS has sole authority to determine whether derivative asylum status should be granted to an applicant. 8 U.S.C. § 1158(b)(1)(A); 8 C.F.R. § 208.21(d); 9 FAM 203.3-4(a)(1), 203.5-3(a)(1).

196.    USCIS is the DHS administering agency with primary responsibility for adjudicating I-730 Refugee/Asylee Relative Petitions for derivative asylum status. 8 C.F.R. § 208.21(d); 9 FAM 203.3-4(a)(2), 203.5-3(a)(2).

197.    When USCIS approved Asylee Plaintiffs' respective Form I-730 Refugee/Asylee Relative Petitions, Derivative Plaintiffs were given the same status and thus became derivative asylees. At a minimum, Derivative Plaintiffs are seeking asylum.

198.    Now that USCIS has granted Asylee Plaintiffs' Form I-730 Petitions for each of the Derivative Plaintiffs, the State Department's only role is to determine whether Derivative Plaintiffs are eligible to travel to the United States based on specified factors, and to grant or deny boarding foils based on those factors.

199.    By Proclamation 10949's plain language, the travel restrictions enacted therein do not apply to Plaintiffs because the Proclamation states that it: (i) "shall not apply to an individual who has been granted asylum by the United States;" and (ii) "shall [not] be construed to limit the ability of an individual to seek asylum."

200.    Further, none of the policy reasons set out in Proclamation 10949 for barring the entry of Afghan nationals apply to Plaintiffs. Plaintiffs have demonstrated their commitment to the United States' democratic mission, and their family members have applied for boarding foils, which the State Department does not consider to be visas. *See* 9 FAM 203.5-6. Moreover, concerns that "Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures," 90 Fed. Reg. at

24499, are inapplicable to Derivative Plaintiffs given Asylee Plaintiffs' opposition on the battlefield to the current Taliban government, and because Derivative Plaintiffs have undergone substantively the same heightened vetting as the family members of Afghan SIV holders, who are exempt from Proclamation 10949's restrictions.

201.    EO 13780 and Proclamation 9645 both stated that they "shall not apply to an individual who has been granted asylum by the United States," and that they "shall [not] be construed to limit the ability of an individual to seek asylum." Proclamation 10949 contains that same language.

202.    In implementing EO 13780 and Proclamation 9645, the State Department adopted a policy that follow-to-join beneficiaries with an approved Form I-730 Refugee/Asylee Relative Petition were exempt from the travel restrictions enacted in those executive actions.

203.    Without reason, the current State Department has adopted the opposite policy and practice: that Proclamation 10949 renders I-730 beneficiaries ineligible to receive boarding foils to travel to the United States.

204.    The State Department has departed from its prior policy *sub silentio*, in violation of the principles articulated in *F.C.C. v. Fox Television Stations, Inc.*, 566 U.S. 502 (2009).

205.    Based on its unlawful policy and practice, the State Department has wrongfully denied boarding foils to the Derivative Plaintiff family members of Plaintiffs AA, BB, CC, DD, and EE.

206.    It is also a forgone conclusion that, absent a reversal of this unlawful policy, the State Department will wrongfully deny boarding foils to the family members of Plaintiffs FF and GG after their interviews are conducted.

207.    Derivative Plaintiffs are otherwise eligible to travel to the United States.

208.    The State Department's policy of refusing to issue boarding foils to derivative asylees who are otherwise eligible to travel to the United States also constitutes a legislative rule issued without observance of the notice and comment procedure required by 5 U.S.C. § 553.

209.    For these reasons, the State Department's policy that Proclamation 10949 applies to derivative asylees is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and made without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(A)–(D).

210.    The State Department's application of Proclamation 10949 to derivative asylees must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

## CLAIM TWO
### *Accardi* Doctrine & Administrative Procedure Act

211.    The foregoing allegations are repeated and re-alleged as though fully set forth herein.

212.    The State Department's application of Proclamation 10949 to derivative asylees violates agency rules, regulations, policies, and procedures, including those in 8 C.F.R. § 208.21(d); USCIS Policy Manual Volume 4, Chapter 5; and 9 FAM 203.5.

213.    The State Department's application of Proclamation 10949 to derivative asylees should therefore be set aside under the principles articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

214.    The failure of the State Department's implementation of Proclamation 10949 to comply with applicable rules, regulations, policies, and procedures renders the State Department's actions arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction,

authority, or limitations, or short of statutory right; and made without observance of procedure required by law. *See* 5 U.S.C. § 706(2)(A)–(D).

215.    The State Department's application of Proclamation 10949 to derivative asylees must therefore be set aside pursuant to the APA. *See* 5 U.S.C. § 706(2).

## CLAIM THREE
### Violation of the Fifth Amendment Due Process Clause

216.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

217.    Plaintiffs have an entitlement to benefits under the derivative asylum process, including the admission of eligible and admissible family members to the United States who have already been approved as derivative asylees by USCIS, subject only to an individualized determination of their travel eligibility by the State Department.

218.    The benefits afforded to asylum holders and their approved beneficiaries confer on Plaintiffs a right that can be deprived only pursuant to procedural due process.

219.    The State Department's blanket denial of approved Afghan derivative asylees' admission to the United States violates the procedural due process guarantees protected by the Fifth Amendment to the U.S. Constitution.

220.    As a result of Defendants' actions, Plaintiffs' Fifth Amendment rights to due process have been violated.

221.    Defendants' violation of due process has caused Plaintiffs to suffer ongoing and irreparable harm.

### COUNT FOUR
### Unconstitutional Deprivation of Due Process (Vagueness)

222.    The foregoing allegations are repeated and re-alleged as though fully set forth herein.

223.    Federal law is unconstitutionally vague and thus violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015).

224.    In the alternative to the claims above, Proclamation 10949, as applied to derivative asylees, is unconstitutionally vague because it enables Defendants to engage in its arbitrary and discriminatory application in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

225.    As a result of Defendants' actions, Plaintiffs' Fifth Amendment rights to due process have been violated.

226.    Defendants' violation of due process has caused Plaintiffs to suffer ongoing and irreparable harm.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1)    Declare unlawful and set aside the State Department's policy applying Proclamation 10949 to follow-to-join asylees as used to deny boarding foils to Derivative Plaintiffs as arbitrary and capricious, an abuse of discretion; not in accordance with law; contrary to constitutional right, power, privilege, or

immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and made without observance of procedure required by law;

2) Declare the State Department's policy used to deny boarding foils to Derivative Plaintiffs unconstitutional and violative of the Due Process Clause of the Fifth Amendment, or alternatively declare Proclamation 10949, as applied to Derivative Plaintiffs, unconstitutionally vague as violative of the Fifth Amendment to the Constitution;

3) Vacate and set aside the State Department's denial of boarding foils to Derivative Plaintiffs AA Spouse, AA Child 1, AA Child 2, BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, BB Child 6, CC Spouse, CC Child 1, CC Child 2, CC Child 3, DD Spouse, DD Child 1, DD Child 2, DD Child 3, EE Spouse, EE Child 1, EE Child 2;

4) Order the State Department to show cause, within seven days of the Court's resolution of this case, why Derivative Plaintiffs AA Spouse, AA Child 1, AA Child 2, BB Spouse, BB Child 1, BB Child 2, BB Child 3, BB Child 4, BB Child 5, BB Child 6, CC Spouse, CC Child 1, CC Child 2, CC Child 3, DD Spouse, DD Child 1, DD Child 2, DD Child 3, EE Spouse, EE Child 1, and EE Child 2 should not be deemed eligible to travel pursuant to the State Department's criteria and provided with boarding foils;

5) Issue a permanent injunction enjoining the State Department, including its officials, agents, employees, assigns, and all persons acting in concert or participating with them, from denying boarding foils to Derivative Plaintiffs on the basis of Proclamation 10949;

6)  Award Plaintiffs attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

7)  Award such other and further relief that the Court deems just and proper.


Dated: October 21, 2025                    Respectfully submitted,

*/s/ Ryan Scarborough*
Ryan T. Scarborough (VSB No. 43170)
William P. Ashworth
(*pro hac vice* forthcoming)
Danielle J. Barondess
(*pro hac vice* forthcoming)
Julian Yigal Kritz
(*pro hac vice* forthcoming)
Lindsay P. Hannibal (VSB No. 97008)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
rscarborough@wc.com
washworth@wc.com
dbarondess@wc.com
jkritz@wc.com
lhannibal@wc.com

Ghita Schwarz (*pro hac vice* forthcoming)
Guadalupe Aguirre
(*pro hac vice* forthcoming)
Pedro Sepulveda (*pro hac vice* forthcoming)
INTERNATIONAL REFUGEE
ASSISTANCE PROJECT
One Battery Park Plaza, 33rd Floor
New York, NY 10004
Telephone: (516) 838-1655
Fax: (516) 324-2267
gschwarz@refugeerights.org
laguirre@refugeerights.org
psepulveda@refugeerights.org

Michael Kershow
(*pro hac vice* forthcoming)
KELER & KERSHOW, PLLC
800 Connecticut Avenue NW
Suite 300

Washington, DC 20006
Telephone: (301) 367-2019
mkershow@kelerkershow.com

*Counsel for Plaintiffs*