# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

AA, *et al.*,                                              )
                                                          )
        Plaintiffs,                                       )
                                                          )
                                                          )
        v.                                                )    Civil Action No. 1:25-CV-01819 (AJT/WEF)
                                                          )
UNITED STATES DEPARTMENT OF                               )
STATE, *et al.*,                                          )    **DECLARATION OF**
                                                          )    NICOLAS BARTELL
                                                          )
        *Defendants.*                                     )
_____                   )

I, Nicolas Bartell, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.    I am the Associate Director of the Fraud and National Security Directorate ("FDNS") within U.S. Citizenship and Immigration Services ("USCIS"), a component agency within the Department of Homeland Security ("DHS"). The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and conversations that I observed and participated in with my staff.

2.    In my current position as Associate Director, I oversee the USCIS response to national security concerns and incidents.

3.    I have been the Associate Director of FDNS since July 12, 2026. I began my career with USCIS in 2008. Before becoming Associate Director of FDNS, I served as Acting Associate Director for FDNS and as Senior Counselor and Strategic Policy Advisor to the Office of the Director from September 2025 to April 2026. From December 2022 to September 2025, I held a permanent position as the leader of the Fraud Integrity and National Security Branch within the Field Operations Directorate (FOD), where I

oversaw national security cases and managed the intelligence program. From March 2024 to September 2025, I was detailed to the Office of the USCIS Director, first as a project manager and later as a senior advisor. Prior to that, I was the deputy district director for the Atlanta District, and the field office director for the Montgomery, Alabama, Field Office from 2016 to 2020.

4. FDNS is responsible for safeguarding the integrity of the nation's lawful immigration system by leading agency efforts to combat fraud, detect national security and public safety threats, and maximize law enforcement and Intelligence Community Partnerships.

5. I am familiar with Presidential Proclamation 10949, Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats, and with Presidential Proclamation 10998, Restricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States, (the "Proclamations") that imposed restrictions and limitations that were necessary, in President Trump's judgment, to prevent the entry or admission of foreign nationals from certain listed countries about whom the United States Government lacks sufficient information to assess the risks they pose to the United States due to identity-management and information-sharing inadequacies.

6. I understand the purpose of the Proclamations to be to restrict entry of certain foreign nationals due to deficiencies in the source data from the named countries. USCIS and its vetting partners use the source data to assess admissibility and ensure that foreign nationals who would threaten national security and public safety are not admitted to the United States.

7.    Since the issuance of Presidential Proclamations 10949 and 10998, USCIS has been working to further enhance our screening and vetting protocols to address inadequacies identified in the Proclamations. When other countries fail to collect and share robust data, it limits the ability of USCIS and its vetting partners to thoroughly screen and vet foreign nationals. By restricting issuance of travel assurances to beneficiaries of approved FTJ-A petitions from the countries listed in the Proclamations, USCIS is doing its part to ensure that no inadmissible foreign nationals from countries identified by the President as having deficient screening and vetting protocols are admitted to the United States.

8.    USCIS relies on biometric vetting as the primary method for verifying identity, a foundational step in immigration vetting. However, the unavailability of biometric information and information-sharing agreements requires USCIS to rely solely on self-reported biographic information to verify identify. Reliable and credible identity and civil documents are crucial to ensure USCIS completes security and background checks using accurate identity information. Moreover, reliable and credible civil documents are vital to verifying family relationships in an immigration system that allows for family-based immigration pathways.

9.    The countries identified by the Proclamations generally possess little to no credible identity management infrastructure. This makes it very difficult, if not impossible, for USCIS to rely on civil and identity documents presented by applicants from the identified countries when performing identity verification, conducting adequate or comprehensive screening and vetting, or evaluating eligibility for immigration benefits. Where there are no identity management infrastructures in place, pervasive

corruption and the ease with which someone can obtain a genuine document through fraudulent means limits the utility of these documents as proof of identity or eligibility. Consider the following seven examples based upon USCIS' assessments and from the Department of State Reciprocity Guide:

a. Somalia does not have a competent civil document authority, and many historical records were destroyed during civil strife. The Somali government issues civil and identity documents based on testimony provided by uncorroborated and unverified sources.

b. Yemen does not have a reliable system for civil or vital statistics, and documents are seldom issued contemporaneously. Many Yemeni nationals only request identification and civil documents for immigration purposes years or decades after an event has occurred. When issuing documents, Yemeni authorities rely on the testimony from persons who sometimes lack direct knowledge of events to which they are testifying.

c. In Afghanistan, birth documents are so scarce and unreliable that Department of State does not require them for visa issuance purposes. The Tazkera, which serves as the national identity document and is used to apply for a passport, is oftentimes issued based on information provided by a community elder or local leader without corroborating evidence. Corruption in Afghanistan is extremely high, further undermining document credibility.

d. Nigerian documents also have limited credibility due to corruption. In Nigeria, it is common for government officials to falsify records. Furthermore, Nigerian birth and death registrations rarely happen at the time of the event, and often only

occur when needed, which can be years later. Many Nigerian marriage and divorce events are not recorded in formal government databases. When they are, record keeping is poor to non-existent.

e. When South Sudan gained independence in 2011, they began issuing their own civil documents. All documents from previous regimes became invalid. This created a situation where many nationals had to acquire formal civil and identity documents decades later. South Sudan also issues an "age assessment", which is an attempt to establish a person's true age.

f. In Angola, civil unrest has often limited the general availability of identity documents. Late registration of births is also common.

g. In Sierra Leone, nationals can simply acquire identity documents containing whatever information is desired.

10. The Court's vacatur of the Proclamations for the FTJ-As prevents USCIS from adequately addressing the risks identified in the high-risk countries, developing plans to manage these risks, and adjudicating petitions and applications from foreign nationals of these countries in a way that is fair, uniform, and consistently protects national security, the integrity of our immigration system, and the American people.

11. The main harm of the Court's vacatur is that until USCIS is prepared to fully implement maximum vetting capabilities, cases will be adjudicated without the benefit of review through maximum vetting. As a result of the Court's vacatur, USCIS will miss critical national security, public safety, or integrity concerns that put the American people and the lawful immigration system at risk. Further, USCIS may face challenges coordinating with its law enforcement and intelligence community

partners to combat these risks and ensure immigration benefits cannot be used to facilitate terrorist-related activities, criminal acts, or to exploit immigration processes. Once asylum status is granted, it is often more difficult to terminate that status and remove the foreign national than it is to deny an FTJ-A petition due to national security or public safety concerns in the first instance.

12. By ordering Defendants to issue boarding foils for Plaintiffs AA, BB, CC, DD, and EE within 15 days, the Court requires USCIS to disregard public safety and national security determinations the President has deemed as necessary for USCIS to carry out its duties under the Homeland Security Act as delegated to the Secretary of Homeland Security. The Court's order prevents USCIS from fulfilling its statutory responsibility to administer the lawful immigration system as well as its responsibility to ensure the most stringent vetting is completed prior to travel, because even the most stringent vetting is only as good as the source data being vetted against and the President has determined that the source data for these high-risk countries is deficient.

13. By ordering Defendants not to apply the Proclamations to follow-to-join asylees as used to deny boarding foils and to complete the adjudication of the FTJ-A petitions of Plaintiffs FF and GG and to all other pending follow-to-join asylum beneficiaries as used to deny boarding foils, the Court requires USCIS to disregard public safety and national security determinations the President has deemed necessary for USCIS to carry out its duties under the Homeland Security Act as delegated to the Secretary of Homeland Security. The result of the Court's order is requiring USCIS to vet against source data that the President has determined has concerning deficiencies. USCIS is

also harmed by not being able to comply with determinations that the President has made regarding public safety and national security.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746; that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of August 2026, in Camp Springs, Maryland.